UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

BALLY TOTAL FITNESS
OF THE MID-ATLANTIC, INC.,
            Plaintiff


        v.                                C.A. No. 11-349-ML

JOSEPH IACIOFANO
            Defendant.

**MEMORANDUM AND ORDER**

## I.   Introduction

    The plaintiff in this landlord/tenant dispute, Bally Total Fitness of the Mid-Atlantic, Inc. ("Bally") is a Delaware corporation.  The defendant, Joseph Iaciofano ("Iaciofano") is a resident of Rhode Island, where he conducts business as Mini Mall Properties, a Rhode Island company.  For the past thirty years, Bally, or one of its predecessors in interest, has been leasing space for a fitness center (the "Premises") in a shopping center (the "Shopping Center") owned by Iaciofano, pursuant to a series of leasing agreements.

    After a fire damaged the Premises in 2011, Iaciofano conducted some repairs and invited Bally to resume its operations. Bally, however, took the position that the repairs were incomplete; that they had not been performed within the period required by the Lease; and that the Shopping Center was in violation of applicable

1

fire and life safety regulations.  Based on these assertions, Bally declared the most current leasing agreement (the "Lease") terminated; it commenced suit against Iaciofano for breach of contract; and it sought a declaration from this Court that the Lease was terminated due to Iaciofano's breach.  Iaciofano countersued for breach of contract, negligence, and unjust enrichment. He too seeks a declaration regarding the validity of the Lease.  The matter pending before this Court is Bally's motion for summary judgment on its claims and partial summary judgment on Iaciofano's claims, with the exception of a negligence claim asserted by him.

## II.  Factual Background[1]

Since September 12, 1980, Iaciofano has been leasing the Premises - which is located in a Shopping Center - to Bally (or one of its predecessors in interest) as a fitness center. Amended Complaint ¶¶ 7-13. On August 10, 2000, the parties executed the "Fifth Amended Lease," which is at issue in this case.  Id. ¶ 10, 14. Pursuant to the Lease, Iaciofano warranted that "[t]he Shopping Center is currently in compliance with all ordinances, rules, regulations and restrictions governing the present uses of the

---

[1]

The background summary is based primarily on Bally's Statement of Undisputed Facts ("SUF")(Docket # 30) and those allegations in the amended complaint (Docket # 16) that have been admitted by Iaciofano. Disagreements by the parties regarding other assertions are noted.

Shopping Center" and that he had "received no notice, and has no actual knowledge, that the Shopping Center or the Building violates any applicable zoning ordinance, fire regulation, building code, health code, or other governmental ordinances, orders, or restrictions." Complaint ¶¶ 15, 16 Lease § 6.1(a)(v). In the event there was a breach of such covenants, Bally was entitled, after ten (10) days notice to Iaciofano and affording him thirty (30) days to cure,(A) to a set-off against the rent for losses and expenses it suffered, or (B) to pursue other tenant's remedies, including injunctive relief.[2]

On April 13, 2004, the Shopping Center was inspected by the North Providence Division of Fire Prevention. Following the inspection, Iaciofano was notified of several fire and life safety code violations. Complaint ¶ 21, SUF 9. The notice stated that the violations had to be corrected no later than 30 days from receipt. SUF Ex. B. On July 27, 2004, the North Providence Fire Marshal's Office issued an inspection report identifying eight separate violations, including lack of adequate detection coverage by the fire alarm system, inadequate fire extinguisher coverage, and the necessity of installing a sprinkler system in the building. Complaint ¶ 22, SUF 10. Iaciofano appealed the violations. On September 20, 2005, the Fire Safety Code Board of Appeal and Review

---

[2]
    Section 6.1 of the Lease does not explicitly provide for termination as a possible remedy in case of Iaciofano's breach of a covenant thereunder.

3

(the "Board") conducted a hearing, following which an appointed subcommittee conducted an on-site review of the Shopping Center. Complaint ¶ 23.

On November 16, 2005, the Board issued its decision, once again outlining the various deficiencies identified more than a year earlier.  The Board also granted Iaciofano a 120 day variance to bring the Shopping Center into compliance. Complaint ¶ 24, SUF ¶ 11.  According to Bally, Iaciofano failed to correct any of the identified violations and, instead, filed a second appeal. Complaint ¶ 25, SUF ¶ 12.  Bally also asserts that the Board granted an additional variance on April 10, 2007, but that Iaciofano still failed to bring the Premises into compliance within that new deadline.  Complaint ¶ 25, SUF ¶¶ 13, 14. In response to Bally's allegations, Iaciofano maintains that he "was not required to correct the violations until the expiration of the various appeal periods . . . and that these violations were corrected during those various appeal periods, as evidenced by the North Providence Fire Department ["NPFD"] notification on November 8, 2011." Iaciofano's Amended SUF ¶¶ 12, 14. (Docket # 40).  The April 10, 2007 decision by the Board, however, clearly states that "[f]ailure of [Iaciofano] to initially comply with the full Decision of the Board, within the stated time frame, shall void all variances granted herein."  (Docket #30-5).

Iaciofano does concede that the NPFD notified him on August

4

18, 2007 and, again, on August 27, 2008, that the violations had yet to be corrected and that the case had been turned over to the State Fire Marshal's office.  SUF ¶ 15.  By letter dated September 19, 2008, Bally informed Iaciofano that it was unable to renew its state health club license "due to [Iaciofano's] failure to bring the sprinkler system for the building in compliance with code." SUF Ex. G (Docket # 30-7). Bally also pointed out that, pursuant to paragraph 8 of the Lease, Iaciofano was required "to keep and maintain the facilities outside the Premises and [sic] in compliance with all legal requirements." Bally further stated that the letter was intended as a Tenant notice for a breach of a covenant and that Bally reserved all its rights under the Lease. Id.   According to Bally, Iaciofano failed to correct the deficiencies within thirty days of Bally's letter. SUF ¶ 17. In response to this particular allegation, Iaciofano states that "this is a legal conclusion and not a fact, insofar as he was not required to correct the violations until the expiration of the various appeal periods." Iaciofano's Amended SDF ¶ 17. As before, Iaciofano maintains that the violations were eventually corrected as set forth in the November 8, 2011 NPFD notification. Id. However, by letter dated October 12, 2009, the NPFD confirmed that the Premises were still in violation of the Rhode Island Fire Code at that time. SUF Ex. H (Docket # 30-8).

On February 6, 2011, a fire damaged the Shopping Center and

rendered the Premises untenantable. SUF ¶ 19.  Under the terms of the Lease, if the Shopping Center was damaged by fire and precluded access to, or use of, the Premises, "[r]ent shall abate based upon the extent to which access or use of the Premises as a health club as it was prior to the casualty has been impaired."  Lease § 12.4(a)(ii), SUF Ex. A (Docket # 30-1). Bally had already paid the full February rent ($34,531) and, because of an oversight, also paid the full March rent. Id. ¶ 21.  According to Bally, "[a]s of August 8, 2011[3] (180 days after the fire), no operational sprinkler system was in place on the Premises or the Building."  SUF ¶ 23. Iaciofano disputes that allegation generally and he "more specifically disputes the allegation that the sprinkler system was required at that time because only the governmental authorities had the right to make that determination."  As before, Iaciofano maintains that the violations were eventually corrected as attested by the November 8, 2011 NPFD notification. Iaciofano Amended SDF ¶ 23.

By letter dated October 12, 2011, Bally notified Iaciofano that it was terminating the Lease based upon Iaciofano's failure to complete the required repairs and restorations within 180 days of the date of the fire. SUF ¶ 24. Since the commencement of this litigation, Bally has paid five months' rent into the registry of

_____

[3]
As Bally points out elsewhere it its submissions, the 180 day period actually expired on August 5, 2011.

this Court.  SUF ¶ 25.  Iaciofano has re-leased the Premises to a
new tenant. SUF ¶ 27.

### III. Procedural History

On August 4, 2011, Bally filed a complaint against Iaciofano
for breach of contract and sought to establish its rights and
obligations under the Lease.  (Docket # 1).  On August 10, 2011,
Bally requested to deposit its monthly rent payments into the
registry of the Court (Docket # 2), which request was granted on
August 31, 2011.  Iaciofano filed an answer to the complaint on
September 13, 2011 (Docket # 7) together with a counterclaim
against Bally, in which he asserted that Bally had breached the
Lease by negligently causing the fire, refusing to re-occupy the
Premises after the repair, and refusing to pay rent.

After obtaining leave to amend its original complaint to
"include[] additional grounds for finding that [Iaciofano] has
breached the Lease," Mem. 2-3 (Docket # 15-1), Bally filed an
amended complaint on November 18, 2011, to which Iaciofano
responded on December 5, 2011. (Docket # 18). In his answer,
Iaciofano asserted nine affirmative defenses, including equitable
estoppel and waiver, and he asserted counterclaims of Breach of
Contract (Count I), Negligence (Count II), and Unjust Enrichment
(Count III).  In addition to compensatory damages, Iaciofano sought
a declaration that the Lease continues to be valid and binding and
that Bally is required to resume its tenancy.

In the interim, Bally filed a motion to release to Bally all amounts on deposit in the registry of the Court (Docket # 17). Bally stated that Iaciofano "had failed to repair the Premises within the Lease-mandated 180-day repair period" and that Bally, therefore, was entitled to terminate the Lease upon written notice. Mem. 2 (Docket # 17-1). Iaciofano objected (Docket # 19), arguing that the escrow should remain until the Court determined the rights of the parties.  On January 3, 2012, the Court granted Bally's motion in part by vacating the order requiring Bally to deposit monthly rent payments in the future. (Text Order Jan. 2, 2012). However, Bally's request for release of existing funds was denied and Bally was required to and did deposit additional rent payments that had become due in December 2011 and January 2012.

On February 16, 2012, Bally filed a motion for summary judgment (Docket # 29), to which Iaciofano filed a response in opposition on March 30, 2012. (Docket # 33). Bally filed a reply on April 10, 2012 (Docket # 35). On May 24, 2012, by leave of the Court, Iaciofano filed an amended Statement of Disputed Facts ("Iaciofano SDF")(Docket # 40) and a Statement of Undisputed Facts ("Iaciofano SUF")(Docket # 41), in response to which Bally filed a supplemental reply memorandum on May 31, 2012 (Docket # 42).

## IV. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if it "could be resolved in favor of either party," and a fact is "material" if it "has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 19 (1st Cir. 2004)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50, 106 S.Ct. 2505, 91 L.Ed.2d (1986)).

The burden of establishing the lack of a genuine issue of material fact rests on the party seeking summary judgment. Merchants Ins. Co. of New Hampshire, Inc. v. U.S. Fidelity and Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998). Once that burden has been met, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in [Rule 56 of the Federal Rules of Civil Procedures] - set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). In considering a motion for summary judgment, the Court "read[s] the record in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor." Merchants Ins. Co. of New Hampshire, Inc. v. U.S. Fidelity and Guar. Co., 143 F3d. at 7 (citing Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997)).

**V. The Parties' Positions**

(A)  Bally's Motion for Summary Judgment

9

Bally seeks a declaration from this Court that it properly terminated the Lease. In the alternative, Bally suggests that the Lease was "equitably terminated" because (1) Iaciofano was in default for years prior to the fire, and (2) Iaciofano failed to provide a timely cure after Bally notified him of the existing breach. Bally seeks the release of all funds it paid into the Court registry and, regardless of the determination on its motion, Bally seeks an order requiring Iaciofano to refund Bally's rent payments for February and March 2011, based on the rent abatement provision in the Lease.

Specifically, Bally states that the Shopping Center was in violation of state and local fire codes from April 13, 2004 through November 8, 2011. Instead of correcting those violations, *e.g.* by installing a sprinkler system, Iaciofano chose to appeal the July 27, 2004 Fire Marshal report.  More than two years after the initial decision by the Board, the Shopping Center was still in violation.

Bally also points out that, after the February 6, 2011 fire rendered the Premises untenantable, Iaciofano failed to complete the necessary repairs and restorations by August 5, 2011.  Because the Lease provides that such repairs must be completed "within one hundred eighty (180) days after the date of the casualty," Bally asserts that it was entitled to terminate the Lease upon written notice to Iaciofano.

10

Finally, Bally suggests that, in the alternative, the Court should grant Bally's motion for summary judgment because "Iaciofano was in default of Lease covenants for many years and he failed to cure his default following Bally's written notification." Bally Mem. 8.

(B)  Iaciofano's Objection

Iaciofano does not dispute the content of the various Lease provisions and violation notices cited by Bally.  He suggests, however, that Bally was aware of the violations and was advised of Iaciofano's continued non-compliance, yet Bally "took no action to claim breach and enforce its 'termination rights' when the violations occurred, or at any other time until after the fire." Obj. Mem. 2.  Iaciofano also alleges that the fire was caused by the negligence of a Bally employee. Id.  Although Bally sent a notice of breach to Iaciofano on September 19, 2008, it failed to take any action to enforce the consequences of the breach. According to Iaciofano, "[i]nstead, [Bally] continued to occupy the Premises and operate its business there, while its members were (presumably) at significant risk from these serious fire and life safety code violations."  Id. at 3.

Iaciofano further argues that (1) after certain repairs on the Shopping Center had been completed, the Town of North Providence issued a temporary Certificate of Occupancy ("CO") for the Premises; (2) Bally was "actively engaged in cooperation" with

11

Iaciofano in refurbishing the Premises; (3) Bally waived its right to insist on lease termination on the basis of a code violation; and (4) "the code violations were corrected before the expiration of the extension period granted by the Town." Id. at 4.

Iaciofano also asserts that there are various factual matters in dispute which require a trial. He suggests that the lease "does not . . . expressly require a sprinkler system.  Instead, it requires that the Premises be in compliance with local codes." Id. at 5. He further states that Bally's delay in bringing suit against Iaciofano for a series of breaches of the Lease dating back to 2004 constituted an "unreasonable delay," and that the "intervening prejudice to [Iaciofano] is, of course, the fire itself, which occurred as a result of [Bally's] own negligence..." Id. at 7. With respect to Bally's unwillingness to re-occupy the Premises, Iaciofano argues that the existence of code violations do not always prevent legal occupancy and that a government official's determination whether to issue a certificate of occupancy is fact driven. Id. at 8.

(C) Bally's Response

Bally maintains that, once Iaciofano failed to complete the necessary repairs within the 180 day period and Bally provided him with proper notice, it had an absolute contractual right to terminate the Lease.  Neither the issuance of a temporary CO, nor the correction of code violations within the time variance granted

to Iaciofano by the Town of North Providence was sufficient to satisfy Iaciofano's obligations under the Lease.  Under the Lease, Iaciofano specifically warranted that he would cause the Shopping Center to comply with applicable "fire regulations, building codes . . . and all other applicable governmental ordinances, orders, or restrictions." Although Iaciofano was repeatedly given additional time to correct the noticed violations, they, nevertheless, continued to exist. Moreover, under the terms of the Board's decision, Iaciofano's failure to comply effectively voided the variances.

With respect to Iaciofano's argument that Bally waived its rights under the Lease by failing to object to continuing code violations, Bally points to Section 21.19 of the Lease which provides that "[n]o term, covenant, or condition of the Lease shall be deemed to have been waived by a party unless such waiver is in writing and signed by the waiving party."

## VI.   The Lease

In the Amended Complaint as well as in its motion for summary judgment, Bally relies on three specific provisions in the Lease. First,  Article 6, titled "Landlord's Agreements," sets forth certain obligations of Iaciofano, who is defined as the landlord of the Shopping Center.  Pursuant to Section 6.1, Iaciofano, "represents, and warrants to [Bally]" that "[t]he Shopping Center is currently in compliance with all ordinances, rules, regulations

13

and restrictions governing the present uses of the Shopping Center." Lease 6.1(a)(v). Further, Iaciofano warrants that he "has received no notice, and has no actual knowledge, that the Shopping Center . . . violates any applicable zoning ordinance, fire regulation, building code, health code, or any governmental ordinances, orders or restrictions." Id. Iaciofano must "cause the Shopping Center (including, without limitation, the Common Areas and the exterior of the Building), as well as the operation and maintenance thereof, to comply with all applicable zoning ordinances, fire regulations, building codes, health codes, the ADA and all other applicable governmental ordinances, orders, or restrictions." Id. In the event any of Iaciofano's representations were or became untrue, or the covenants in Section 6.1 were breached, Bally had the option "in its sole discretion, after ten (10) day's notice to [Iaciofano] and, in the event of a breach of covenant only and then except in an emergency, after thirty (30) days for [Iaciofano] to cure (or such longer cure period as may be reasonable under the circumstances, provided that [Iaciofano] commences such cure within such thirty (30) day period and diligently prosecutes the same to completion): (A) set-off all actual and liquidated losses and expenses suffered by [Bally] on account of such breach against the Rent payments then due and coming due hereunder; and/or (B) pursue Tenant's remedies at law or equity, including, without limitation, the right to injunctive

relief, cumulatively or alternatively, singularly or in combination." Lease 6.1(b).

The second provision in the Lease on which Bally relies is Article 12, which addresses damage to or destruction of the Premises by fire or other casualty. In essence, if the Premises, the Building and/or the Common Areas are "damaged or destroyed," Iaciofano, if he does not elect to terminate the Lease, is obligated to "promptly rebuild and repair the Premises, the Building and the Common Areas in a first-class manner and with first-class materials to the condition they were in immediately prior to such casualty, at [Iaciofano's] sole cost and expense." Lease 12.2(a). Moreover, "[i]n the event that such repairs or restorations are not completed within one hundred and eighty (180) days after the date of the casualty," Bally had "the right to terminate the Lease upon written notice to [Iaciofano]." 12.2 (b).

The third Lease provision that is significant in this litigation relates to rent abatement. Pursuant to Article 12.4, if "the Building, the Common Areas or the Shopping Center shall be damaged or destroyed by fire or other casualty thereby causing the Premises to be inaccessible"  and if "access to, or use of, the Premises as a health club as it was prior to the casualty is materially impaired, Rent shall abate upon the extent to which access to or use of the Premises as a health club as it was prior to the casualty has been impaired."

In addition, in Bally' first reply memorandum (Docket # 35), Bally responds to Iaciofano's contention that Bally should be estopped from terminating the Lease because it cooperated with Iaciofano's post-fire repairs.   As Bally points out, the Lease provides that "[n]o term, covenant, or condition of the Lease shall be deemed to have been waived by a party unless such waiver is in writing and signed by the waiving party."   Lease 21.19.   There is no assertion on Iaciofano's part that such a written waiver exists.

**VII. Discussion**

A. The Safety Violations

The terms of the Lease and the resulting rights and obligations on the parties are not in dispute.   Likewise, there is no dispute that on April 13, 2004, while the Lease was in effect, the North Providence Division of Fire Prevention notified Iaciofano of a list of fire and life safety code violations, which had to be corrected within thirty days.   (Docket # 30-2).   *Inter alia*, "[t]he fire alarm system failed to notify all the occupants of the building that there was an alarm therein" and the occupants failed to exit the building.   Id.

Under the plain terms of the Lease, Iaciofano agreed to cause the Shopping Center to comply with fire regulations.   As is clear from the inspection report issued by the Fire Marshal on July 27, 2004, the failing alarm system was not brought into compliance within the set time period.   (Docket # 30-3).   Pursuant to the

subsequently issued Fire Marshal's report, Iaciofano was required to correct eight separate deficiencies, which included installation of a sprinkler system.  Notwithstanding Iaciofano's contention that the allegations by Bally regarding his non-compliance are "incomplete" or "legal conclusions," he does not dispute that the violations existed at that time and that they were not corrected within the time period initially set forth in the notifications.

Likewise, with respect to Bally's detailed recounting of Iaciofano's efforts to appeal the violations rather than correct them, Iaciofano maintains that "he was granted several appeal periods within which to cure any violations." (Docket # 40). The undisputed record reveals that Iaciofano was, in fact, granted two 120 day extensions,[4] but that, nearly two years after the Board's initial decision (and again, in the following year) the NPFD informed Bally that the violations had still not been corrected and that the matter had been turned over to the State Fire Marshal's Office.  Shortly after the second  notification, Bally provided notice to Iaciofano for a breach of covenant under the Lease for his failure to comply with applicable fire and safety codes. However, although the undisputed evidence demonstrates that Bally's notice did not prompt Iaciofano to bring the Shopping Center into

---

[4]    In addition to receiving eight months of extensions, during which Iaciofano could have corrected the deficiencies and installed a sprinkler system, the Board took 17 months to consider Iaciofano's second appeal.

compliance, it does not appear that Bally attempted to terminate the Lease at that time, or that it took any other steps to assert its rights under the Lease. Instead, it is undisputed that the Shopping Center was still in violation of the Rhode Island Fire Code on October 12, 2009.

Against those undisputed facts, Iaciofano repeatedly asserts that the violations were eventually corrected, "as evidenced by the NPFD notification from November 8, 2011," more than seven years after the first notification of fire and safety code violations was received. (Docket # 40). However, neither Iaciofano's insistence that he was granted repeated extensions, nor the fact that the violations appear to have been corrected eventually, change the fact that Iaciofano, rather than "caus[ing] the Shopping Center . . . to comply with all applicable . . . fire regulations," directed his efforts solely towards appealing the determination by the Fire Marshal and/or the Board. Moreover, the Board's April 10, 2007 decision clearly stated that the granted variances would be voided if Iaciofano failed to comply with the Board's directives during the specified time frame.

Based on the undisputed facts, Iaciofano failed to adhere to the provision in the Lease which required him to bring the Shopping Center into compliance. As such, he was in breach of Section 6.1 and Bally was entitled, subject to giving notice and affording Iaciofano an opportunity to cure, to set off any losses it suffered

18

or to pursue other legal or equitable remedies.  The Lease sets no time limitations for Bally to exercise its rights for Iaciofano's breach.  Notwithstanding Bally's election to continue its tenancy and not seek legal or equitable remedies at the time the violations first remained uncorrected and, again, after it provided the notice of breach, such election could not be deemed a waiver of Iaciofano's breach "unless such waiver [was] in writing and signed by the waiving party."  Lease 21.19.  In other words, Bally could have terminated the Lease at any time Iaciofano failed to timely cure the breach after receiving Bally's notice, but Bally chose not to do so and, instead, continued to conduct its business at the Premises.[5]

(B) The Restoration

After the February 6, 2011 fire rendered the Premises untenantable, Iaciofano elected to repair the Premises rather than terminate the Lease. Pursuant to Section 12.2(b), the restoration and repair had to be completed within one hundred eighty days, or by August 5, 2011. Bally asserts that, on that date, "no operational sprinkler system was in place on the Premises or the Building," PSUF ¶ 21 and that, because the Shopping Center was still not in compliance with fire or safety regulations, the

---

[5]

Although there is some indication that Bally encountered difficulties in renewing certain permits because of the existing code violations, there are no allegations that Bally discontinued the operation of the health club at any time.

restoration was not complete.  Iaciofano does not dispute that the sprinkler system was not in place, nor does he explicitly dispute Bally's allegations that the restoration was not complete. Instead, he suggests that the sprinkler system was not required at that time "because only the governmental authorities had the right to make that determination."  DSDF ¶ 23.  Iaciofano also states that several temporary Certificates of Occupancy had been issued for the premises; he does not assert, however, that the restoration and repair of the Premises were completed during the 180 period, as required by the Lease.  Therefore, on those undisputed facts, Bally was entitled to terminate the lease any time after August 5, 2011, when the restoration remained incomplete and the Shopping Center was still not in compliance with the fire code.

Likewise, it is undisputed that Bally issued written notice to Iaciofano to terminate the Lease on October 12, 2011.  The Lease provides no further opportunity to cure, and termination of the Lease was, therefore, effective as of October 12, 2011. Iaciofano's continued reliance on generously granted variances to bring the Shopping Center into compliance does not obviate Bally's right to terminate the Lease for failure to complete restoration of the premises within the set time period. Therefore, Iaciofano's objection cannot withstand Bally's motion for summary judgment.

(C) Equitable Termination

Bally suggests that, in light of Iaciofano's longstanding

20

default and failure to cure, the Court should "equitably terminate the Lease." Based on the determination that Bally effectively terminated the Lease for Iaciofano's failure to make timely repairs, the Court declines this invitation because the issue is moot. Moreover, as stated herein in detail, Bally repeatedly had the opportunity to terminate the Lease, but elected not to do so and conducted its business as usual. Equity does not require this Court to fashion a relief of which Bally could have availed itself at any time.

### Conclusion

For the foregoing reasons, Bally's motion for summary judgment is GRANTED with respect to a declaration that the Lease was effectively terminated by Bally as of October 12, 2011 and otherwise DENIED. Bally's motion for partial summary judgment is GRANTED with respect to Iaciofano's claims of breach of contract and unjust enrichment. The parties are instructed to submit, within fourteen (14) days of this Memorandum and Order and in accordance with this Court's determination, brief memoranda addressing (1) the funds on deposit with the Court's registry, and (2) the rent paid during the abatement period.

SO ORDERED.

/s/ Mary M. Lisi

Mary M. Lisi
Chief United States District Judge
June 27, 2012

21